902 P.2d 1372

**Charles Steinle VAN DYKE, (f/k/a Charles L. Steinle), Petitioner–Appellee,**

v.

**Aimee Frederick STEINLE, Respondent–Appellant.**

**No. 1 CA–CV 93–0492.**

Court of Appeals of Arizona, Division 1, Department D.

March 28, 1995.

Review Denied Sept. 26, 1995.*

---

* Corcoran, J., of the Supreme Court, did not participate in the determination of this matter.

Meyer, Vucichevich & Burns, P.C. by Annette T. Burns, Phoenix, for petitioner-appellee.

A. Jerry Busby, P.C. by A. Jerry Busby, Phoenix, for respondent-appellant.

## OPINION

VOSS, Judge.

Appellant Aimee Frederick Steinle (wife) appeals from an order terminating her spousal maintenance from appellee Charles Steinle Van Dyke (husband) after the trial court found substantial and continuing changed circumstances arising from wife's cohabitation with her fiance, Jay Galvin. We conclude that the evidence did not support termination of wife's spousal maintenance, but we remand for the trial court's factual determination of whether certain evidence apparent on this record would support a reduction in spousal maintenance.[1]

### FACTS AND PROCEDURAL HISTORY

In August 1991, a decree of dissolution terminated the parties' marriage.[2] Wife was awarded spousal maintenance under the following terms:

> IT IS ORDERED awarding to Wife for a period of three years, commencing June 1, 1991, the sum of $13,000 per month in spousal maintenance or until the sale of the residence awarded to Wife, whichever event first occurs. In the event of a sale of the residence, Wife shall receive as spousal maintenance, commencing on the first day of the month following the closing, the sum of $8,000 per month for the balance of the three year period. Said

1. Since the filing of this appeal, the three-year spousal maintenance period expired, under the terms of the original decree, on June 1, 1994. Thus, at issue here are only amounts of spousal maintenance accruing from February 19, 1993, through May 31, 1994.

2. On appeal, that decree was affirmed in part, reversed in part, and remanded. *Van Dyke v. Steinle*, 1 CA–CV 91–0598 (Ariz.App. mem. dec. filed Apr. 14, 1994). The amount of spousal maintenance was not challenged on appeal.

payments shall be made directly to Wife so long as they are timely made.

On February 19, 1993, husband filed a petition to modify spousal maintenance, alleging that wife's support should be terminated, or in the alternative, reduced, for four reasons: (1) wife had remarried in December 1992; (2) if wife had not remarried, her income had substantially increased to an amount alleged to exceed $4,000 per month; (3) the decree contemplated the sale of the residence awarded to wife but wife had failed even to list the property for sale, thus continuing her high mortgage payments and corresponding higher spousal maintenance beyond the period anticipated by the decree; and (4) wife's involvement in a continuous and long-standing cohabitation relationship had substantially reduced her living expenses and support needs. Husband stipulated that his ability to pay spousal maintenance was not at issue in the modification proceedings.

At a hearing on the petition, the following facts were evidenced. Approximately six months after the decree was entered, wife's fiance, Jay Galvin, began living with wife and her two children at wife's residence. In August 1992, wife and Galvin informed husband that they were planning to marry on December 5, 1992, in San Francisco. However, in early October 1992, wife discovered that remarriage might terminate her spousal maintenance, and, because she felt she could not afford to lose that income at that time, she cancelled the wedding ceremony.

Because many of the invited wedding guests had made travel plans that could not be changed, wife and Galvin decided to have a party on December 5 in San Francisco in place of the planned post-wedding reception. Additionally, because they had made nonrefundable honeymoon arrangements, wife and Galvin took their planned trip to Anguilla after the party.

Husband believed a wedding had taken place and prorated the December 1992 spousal maintenance payment accordingly, which wife returned with a message indicating she had not remarried on December 5. On the advice of his attorney, husband paid wife's $13,000 spousal maintenance for December 1992, but did not pay the January

and February 1993 payments; instead, he filed his petition for modification with the court.

At the modification hearing, wife testified that she was currently president and director of Elite Solutions, Inc. (ESI), a custom plastics molding company recently started and owned by Galvin, where she did part-time clerical work, including writing checks and handling receivables, and had just started in sales. She did not consider herself an employee of ESI, and received no salary. Rather, she considered her work there to be "schooling," comparable to an internship or apprenticeship in which she would learn the business. Wife and Galvin had orally agreed that she would receive a 50 percent ownership interest in ESI when she and Galvin married or in August 1994, whichever first occurred. No evidence was introduced of ESI's current net worth, but wife testified that it had operated at a net loss during the last two fiscal years.

Beginning in June 1992, ESI had paid some of wife's household expenses including electric, gas, water, telephone, pool service, one-half of the yard service and one-half of household cleaning expenses. Wife testified that these amounts were advanced to her because of husband's delay in sending maintenance payments while he was hospitalized, and that she later reimbursed ESI. She also admitted having access to both ESI's and Galvin's credit cards to use for personal expenses, which she expected to repay from her own funds. Wife provided documentation that ESI had paid $3,745.44 for her utilities and that she had charged additional personal expenses of $2,351.08 on the ESI credit card. As reimbursement, however, wife had paid an ESI credit card bill of $6,820 from her own funds when the company had an inadequate cash flow; offsetting that payment against the amount of her utilities and credit card charges paid by ESI, wife computed that ESI owed her money at the time of the hearing.

Wife admitted that ESI also provided her with child care services by one of its employees, valued at $400 per month, and that ESI also paid wife's business travel expenses of

approximately $100 per month. Wife further testified that ESI had not been able to pay Galvin a salary, but paid his expenses and reimbursed him for loans he had made to the company.

Galvin did not pay any rent "or anything else" for living at wife's home; she did not believe this was "unfair," because she liked having him there, and because the house was titled solely in her name. She testified that she had not incurred any additional expenses as the result of his living there, and that his financial contribution to the household was limited to occasionally buying groceries. When asked what benefits she received from Galvin's living at the house, wife responded, "Oh, he does a lot of maintenance around the house that would normally cost a lot of money to have done."

Although Galvin did not pay household expenses, wife admitted he had paid for the majority of their travel, which included two trips to Mexico, a Disney World cruise, and the trip to Anguilla. He had also purchased a substantial amount of jewelry for wife and her children in 1992, including a $13,000 engagement ring.

At the time of the dissolution, wife's 7,400 square-foot house was valued at approximately $900,000. Wife testified that she did not list the house for sale immediately after the decree was entered because realtors advised her that the market for luxury homes was "soft" at that time, and that she should wait a year. After receiving a call in September 1992 from her realtor advising that the market had improved, wife placed the residence on the market for sale in October 1992 with a listing price of $1.7 million. Since the listing, she felt that activity on the house had been good, and she testified she had shown the home to potential buyers eight times in the week prior to the hearing.

Although her mortgage payment on the house at the time of the decree was approximately $6,200, wife testified that, at the time of the hearing, it had been reduced by about $1,500 per month, to $4,675 until May 1993, when it was expected to stabilize at $5,200 because she had converted from a variable to a fixed rate mortgage. Other expenses on the house, however, had increased because of the expiration of a home warranty since the decree; wife testified she had fixed settling cracks, repainted, and replaced a compressor, hot water heater and pool heater, in addition to incurring expenses in preparing to sell the house.

Husband argued at the hearing that, although he had stipulated that his ability to pay spousal maintenance was not at issue, he believed wife's spousal maintenance should be terminated on a theory of "marriage by estoppel," because he had detrimentally relied on her planned wedding on December 5, 1992, and had taken his current family on "a rather lavish vacation" to Spain, hired a new employee, bought office equipment, and incurred $20,000 in additional debt, in anticipation of the end of his obligation to pay spousal maintenance to wife. Husband admitted that he was aware of wife's "dating" relationship with Galvin at the time of the decree, and admitted that wife would be paying the same household expenses and utilities even if Galvin were not living there; nonetheless, husband believed that Galvin's noncontribution to wife's living expenses was "unfair."

After the evidentiary hearing, the court issued its order terminating spousal maintenance for several reasons. First, the court found that for the past year and a half wife had been living with Galvin in wife's former marital residence in a relationship that was similar to a marriage in all respects except for a marriage license. Second, the court found that the residence had not been sold as anticipated by the dissolution decree, and that it had been placed on the market at substantially above the appraised price. Third, after finding that the intent of the decree's award of temporary maintenance for a three-year period was to enable the wife to achieve financial independence with her reasonable effort, the court reasoned:

> Although the "family" established by Mr. Galv[i]n and Wife is not a legal marriage, it serves the same purpose of providing financial independence for Wife. While it cannot give her the financial independence that she would have had she married Mr. Galv[i]n on December 5, 1992, it does give her a measure of financial independence.

Specifically, Wife now has someone providing for her needs by providing financial support for the maintenance of her household. Mr. Galv[i]n provides other financial support such as the $13,000.00 ring given to Wife prior to the ceremony in December 1992. An additional changed circumstance which is substantial and continuing since August 1991 is the fact that Wife is now living with Mr. J. Galv[i]n. It is her intent to marry Mr. Galv[i]n at some time in the future. She has acquired a type of financial support from Mr. Galv[i]n which has supported her financial needs in part.

Wife has entered into an agreement to provide her half (½) ownership of the business of Mr. Galv[i]n upon remarriage or a time certain in 1994. These changed circumstances give Wife a measure of financial independence from Husband.

The court thus concluded that husband had established substantial and continuing changed circumstances that justified the termination of spousal maintenance, effective January 1, 1993. Upon wife's motion to alter or amend that order, the court changed the effective date of termination to February 19, 1993, but otherwise denied wife's motion.[3] Wife timely appealed.

## DISCUSSION

■ On appeal, we review the trial court's decision regarding the existence of changed circumstances to support a modification of spousal maintenance awarded in a dissolution decree on an abuse of discretion standard. *Nace v. Nace*, 107 Ariz. 411, 413, 489 P.2d 48, 50 (1971); *Fletcher v. Fletcher*, 137 Ariz. 497, 671 P.2d 938 (App.1983). We will not set aside the trial court's findings of fact unless they are clearly erroneous. *In re Marriage of Berger*, 140 Ariz. 156, 161, 680 P.2d 1217, 1222 (App.1983). On questions of law, however, we review *de novo*. *Barry v. Alberty*, 173 Ariz. 387, 389, 843 P.2d 1279, 1281 (App.1992).

In Arizona, modification of spousal maintenance is provided for by statute:

Except as otherwise provided in subsection F of § 25–317, the provisions of any decree respecting maintenance or support may be modified only as to installments accruing subsequent to notice of the motion for modification to the opposing party and only upon a showing of changed circumstances which are substantial and continuing....

Ariz.Rev.Stat.Ann. (A.R.S.) § 25–327(A) (1991). The obligation to pay future maintenance terminates only upon the death of either party or the remarriage of the party receiving maintenance unless otherwise agreed in writing or provided in the decree. A.R.S. § 25–327(B).

On appeal, wife argues that the trial court order terminating spousal maintenance was improper because her cohabitation with Galvin is not a sufficient ground on which to terminate spousal maintenance under A.R.S. § 25–327 and *Smith v. Mangum*, 155 Ariz. 448, 747 P.2d 609 (App.1987). She further argues that husband has failed to establish any substantial or continuing changes in her economic circumstances that would warrant either termination or reduction of her spousal maintenance.

In response, husband argues that wife's financial arrangements with ESI resulted in a substantial and continuing change of circumstances because, even though she did not receive a salary, she derived economic benefits from ESI, and had voluntarily delayed acquisition of ownership of 50 percent of ESI. He asserts that the trial court properly considered the equities of the wife's arrangements with Galvin and ESI as they related to husband in terminating wife's spousal maintenance. Alternatively, husband contends the evidence supports a showing of substantial and continuing changed economic circumstances resulting from wife's cohabita-

---

**3.** We note that the current version of Ariz.Rev. Stat.Ann. § 25–327(A) (Supp.1994) provides that modifications are effective "the first day of the month following the filing of the petition," or a later date. We do not address whether the trial court erroneously prorated the February 1993 spousal maintenance payment of $13,000 be-

cause this issue was not raised by the parties on appeal. We point out the current modification procedure, however, in case a reduction in spousal maintenance is ordered after remand, and to prevent the possibility of future litigation over this point.

tion sufficient to warrant at least a reduction in her spousal maintenance.

We address both termination and modification of wife's spousal maintenance in turn.

## A. Termination of Wife's Spousal Maintenance

██ Unlike some other jurisdictions, Arizona does not provide by statute for the consequences on spousal maintenance of a supported spouses's cohabitation with another person of the opposite sex. *Cf.* former Cal.Civ.Code § 4801.5 (West Supp.1987) (such cohabitation creates a "rebuttable presumption, affecting the burden of proof, of decreased need for support"); Cal.Fam.Code § 4323 (West 1995) (same, except income of supporting spouse's nonmarital partner shall not be considered); N.Y.Dom.Rel.Law § 248 (McKinney (1986) (court may modify support payment upon proof that "wife is habitually living with another man and holding herself out as his wife, although not married to such man"). However, it is established in Arizona that the existence of a cohabitation arrangement or "*de facto* marriage" between a spouse receiving maintenance and a cohabitant is not a sufficient basis, in itself, for termination or reduction of spousal maintenance. *Smith v. Mangum*, 155 Ariz. at 450, 747 P.2d at 611. Rather, only evidence relating to the economic nature of the cohabitation would be relevant to show that wife's support needs have changed since the decree. *Id.* at 451, 747 P.2d at 612. This is so because the "changed circumstances" required by A.R.S. § 25–327(A) clearly refer to "the economic circumstances that justified the original award, as set forth in § 25–319." *Id.* The burden of proof to establish such changed circumstances in this case is on husband, as the party petitioning for modification. *Linton v. Linton*, 17 Ariz.App. 560, 563, 499 P.2d 174, 177 (1972).

In *Smith v. Mangum*, we recognized that, unlike remarriage, cohabitation does not result in the accrual of quasi-marital property rights or the acquisition of a legal support obligation imposed on the cohabitant if the relationship ends. *Id.; accord, In re Marriage of Dwyer*, 825 P.2d 1018, 1019 (Colo. App.1991) (unmarried cohabitants do not as-sume reciprocal obligations of marriage, including support); *Mitchell v. Mitchell*, 418 A.2d 1140, 1143 (Me.1980) (cohabitants have no legal obligation to support each other). According to *Smith v. Mangum*, the "focal point" of the court's inquiry in a cohabitation situation is the recipient's need for continued support. 155 Ariz. at 451, 747 P.2d at 612.

Under *Smith v. Mangum*, we must conclude that the trial court abused its discretion in terminating wife's spousal maintenance. An examination of each of the four grounds alleged by husband in support of termination leads us to the conclusion that husband has failed to establish that wife no longer requires support because of the cohabitation relationship.

### 1. Wife's Remarriage

██ First, husband alleged in his petition that wife had remarried in December 1992. The evidence at the hearing was undisputed that wife and Galvin were not married. Furthermore, husband's asserted "marriage by estoppel" theory based on cohabitation is nonexistent as a ground in support of modification under Arizona law. *See Smith v. Mangum; cf. Hodges v. Hodges*, 118 Ariz. 572, 578 P.2d 1001 (App.1978) (terminated obligation to pay spousal maintenance could not be revived after spouse's remarriage was annulled). To the extent that the trial court found that wife "has acquired a type of financial support from Mr. Galv[i]n" based on the existence of either a "*de facto* marriage" or her intent to marry him in the future, that finding was legally erroneous and did not provide a basis for termination of spousal maintenance.

### 2. Wife's Increased Income

Second, husband argued that, even if she had not remarried, wife's income has significantly increased since the time of the decree; the petition alleged that wife had a current income exceeding $4,000 a month. At the time of the hearing, however, wife's earning ability had not significantly changed since the decree. Although she held the title of president and director of ESI, no evidence contradicted her testimony that her work at ESI was equivalent to an internship because

she was learning a business in which she had no experience so that she could become financially independent. This was the apparent intent of the three-year award of spousal maintenance, which was provided in the original decree for the following reasons:

The Court FINDS Husband's average gross income exceeds $450,000 per year and that Wife presently has no income other than the spousal maintenance to be awarded herein and an unknown amount that Wife is capable of earning consistent with an entry level position of a college graduate in broadcasting.

The Court FINDS that Wife will need child care expenses should she obtain employment. . . .

. . . .

Wife is presently unable to support herself through reasonable employment and is a caretaker of a child of tender years. Wife cannot reasonably support herself on the property apportioned to her in these proceedings.

The Court has considered the fact that both parties were, as a result of Husband's substantial earnings, able to live in a very comfortable lifestyle, including the ownership of the home in which Wife presently resides and which is being awarded to her. The Court was advised during the testimony that the home will be sold and that in today's market it has $200,000 in equity. Until the home is sold and the equity is realized, Wife has substantial expenses necessary to the maintenance of the home.

 Clearly, given these findings, the intent of the decree was to provide wife with a fixed amount of support, even after she gained entry-level employment or obtained further training or education in order to enable her to become financially independent. *See Schroeder v. Schroeder,* 161 Ariz. 316, 321, 778 P.2d 1212, 1217 (1989) (purpose of spousal maintenance is to achieve independence for both parties). Thus, at least part of the award was in the nature of rehabilitative spousal maintenance, which is awarded for a short duration with the specific purpose of enabling job training or other means of entering or advancing in the work force. *See*

*Musgrove v. Musgrove,* 821 P.2d 1366, 1369 (Alaska 1991).

Furthermore, we do not find a substantial change in wife's income evidenced by ESI's payment of wife's utilities and credit card charges totalling $6,096.52 from June to December 1992, because wife reimbursed these amounts to ESI by her payment of an ESI charge bill.

 Likewise, a 50 percent ownership in ESI, which wife was to receive in the future, did not constitute a substantial change in circumstances at the time of the modification hearing. The promise of future ownership did not give her any present income, and no evidence was introduced to establish what the company's net worth or future earnings would be. *See Scott v. Scott,* 121 Ariz. 492, 494, 591 P.2d 980, 982 (1979) (future anticipated changes in income cannot support modification).

### 3. Sale of Wife's Residence

Third, husband contended that the decree anticipated that wife would sell the house shortly after entry of the decree, and that wife's failure even to list the property with a realtor by the date of the petition to modify constituted a change of circumstances that would entitle him to termination of maintenance or at least reduction by $5,000 a month, as was provided in the decree.

 As a preliminary matter, we note that the evidence indicates that wife listed the house for sale at least four months before husband filed the petition to modify. Additionally, no evidence in this record indicates that wife breached the dissolution decree by failing to list the residence immediately after the decree was entered. At the dissolution trial, when asked whether she intended to sell the house, wife answered, "It's a very expensive house to keep up. Probably, eventually I will have to." She also testified that she would probably put the house up for sale a few months after the divorce was final. However, the decree did not order wife to sell the house; it merely noted, "The Court was advised during the testimony that the home will be sold" and that, until it was sold, "Wife has substantial expenses necessary to

the maintenance of the home." Therefore, the fact that wife had not yet sold the house at the time of the modification hearing was not a substantial change in circumstances, not anticipated by the decree, that would warrant termination of spousal maintenance. Nor is this a case in which the record indicates that the income from any net proceeds from the sale of the house would have provided wife with financial independence. *See Deatherage v. Deatherage,* 140 Ariz. 317, 321, 681 P.2d 469, 473 (App.1984).

### 4. *The Economic Effects of Wife's Cohabitation*

As a fourth ground for termination of spousal maintenance, husband alleged that wife's continuous and long-standing live-in relationship with Galvin had substantially reduced her living expenses and eliminated her support needs.

On appeal, wife contends that husband has failed to establish on this record that her economic relationship with Galvin has provided her with financial independence sufficient to terminate spousal maintenance.

In *Smith v. Mangum,* this court held that, although cohabitation was not, in itself, the *de facto* equivalent of marriage that would warrant modification of spousal maintenance, "all evidence relating to the economic relationship between [wife] and [cohabitant] would be relevant and admissible to show that [wife's] support needs have changed. The focal point in a situation of this nature is the recipient's need for support." 155 Ariz. at 451, 747 P.2d at 612 (App.1987). We recognized that this is also the rule in other jurisdictions, citing, as examples, *Brister v. Brister,* 92 N.M. 711, 594 P.2d 1167 (1979), and *Kersten v. Kersten,* 141 Mich.App. 182, 366 N.W.2d 92 (1985). *Smith,* 155 Ariz. at 450–51, 747 P.2d at 611–12.

In *Brister,* the New Mexico Supreme Court acknowledged that support from a "paramour," living with the ex-wife, could be considered as evidence of changed financial circumstances in determining whether her alimony should be reduced. The *Brister* court reasoned:

If the recipient becomes able to support herself after the passage of a period of

time, this constitutes a change in circumstances that has been held to warrant termination of the husband's alimony obligation....

The focal point in each case is the recipient's need for support. We consider Mrs. Brister's salary and the income from her property under present case law. *Actual need being the criterion, what matters if the money comes from an inheritance, a crap game or the largess of a live-in lover?* We hold that this additional resource of Mrs. Brister's may be weighed in determining the amount of alimony that should be paid. We do not consider this ruling to be at odds with [case law] ... that a so-called "de facto" marriage is not, in and of itself, grounds for cancellation of an alimony award.

92 N.M. at 715, 594 P.2d at 1171 (emphasis added, citations omitted). Similarly, in *Kersten,* the court recognized, "While a meretricious relationship alone is not sufficient in and of itself to modify an alimony award, the surrounding circumstances may be." 366 N.W.2d at 93.

On appeal, husband contends that the trial court could consider, as evidence that cohabitation provided wife with financial independence, that wife "*should* be acquiring benefits as a result of a full-time roommate sharing her huge home." He argues that, although the record is clear that Galvin does not pay wife for his room and board:

At a minimum, the Court should presume that Galvin's full-time presence in the ... home requires Galvin's contribution of half the home's expenses. This is a fair allocation even though the parties' children reside there, as Husband also pays $2000 per month in child support as well as 100% of the children's educational and medical expenses.

As authority for this premise, husband cites the equitable approach followed in California. *See In re Marriage of Schroeder,* 192 Cal. App.3d 1154, 238 Cal.Rptr. 12 (App.Dist. 2 1987), and *In re. Marriage of Leib,* 80 Cal. App.3d 629, 145 Cal.Rptr. 763 (App.Dist. 2 1978).

In *Schroeder*, although the wife's cohabitant was not paying any rent or utilities, he did pay for the couple's travel, entertainment, and dining out. The wife paid all the household expenses and grocery bills. The cohabitant did occasional repair work on the house, allowed the wife the use of his car, and bought her a $4,200 diamond ring and new furniture. 238 Cal.Rptr. at 13. The California Court of Appeal found that this living arrangement constituted an "implied contract" under which the wife pays for "ordinary domestic expenses," and, in exchange, the cohabitant pays for "nonessential and luxury items and pays for travel, entertainment, and domestic meals." *Id.* at 17. The court found that, had the cohabitant fully reimbursed the wife for the benefit value of the household expenses, and had the value of the repairs performed by the cohabitant been substituted as cash contributions by him, "it is probable she would have no need for continued support." *Id.* The court therefore reversed the trial court's finding that cohabitation did not affect the wife's financial circumstances, and remanded "for a factual determination of the extent of her reduced need, with due consideration for the value of the benefits received by her, as well as the value of the benefits conferred upon [her cohabitant]." *Id.*

In *Leib*, the court similarly found either an express or implied contract existed between the wife and her cohabitant to each pay his or her own way; in contributing her full-time services as a homemaker, the wife "contribut[ed] the earnings she could [otherwise] realize from independent employment," and the cohabitant paid for restaurant meals, a European vacation, and use of his Ferrari. 145 Cal.Rptr. at 770. The court found the wife's services to the cohabitant a "gift," but found that she had no right to ask for spousal support "in a sum sufficient to enable her to make the gift," and thus reduced her alimony to the extent the value of her services exceeded the value of her use of a Ferrari and a trip to Europe. *Id.*

In this case, husband asks us to adopt a similar analysis to conclude that wife's changed economic circumstances are evidenced by what Galvin should be contributing to her expenses rather than what he actually is contributing, because wife cannot "give away" free room and board. He contends that this analysis is supported by equity and fairness.

We decline to adopt the California approach for one important reason that husband has failed to distinguish. In both *Schroeder* and *Leib*, the courts relied on California's statutory declaration of legislative policy that cohabitation, in and of itself, reduces the needs of the supported spouse. *See Schroeder*, 238 Cal.Rptr. at 17; *Leib*, 145 Cal.Rptr. at 764. At the time *Schroeder* was decided, the relevant statute provided:

> (a) Except as otherwise agreed to by the parties in writing, *there shall be a rebuttable presumption, affecting the burden of proof,* of decreased need for support if the supported party is cohabitating with a person of the opposite sex.

Cal.Civ.Code § 4801.5[4] (emphasis added). Thus, because the *prima facie* existence of a cohabitation in both *Schroeder* and *Leib*[5]

---

**4.** This section was repealed in 1992. *See* Cal. Stats.1992, c. 162 (A.B. 2650), § 3, operative Jan. 1, 1994. The current provision is set forth in Cal.Fam.Code § 4323 (West 1995):

> (a)(1) Except as otherwise agreed to by the parties in writing, there is a rebuttable presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a person of the opposite sex. Upon a determination that circumstances have changed, the court may modify or terminate the spousal support....
>
> (2) Holding oneself out to be the husband or wife of the person with whom one is cohabiting is not necessary to constitute cohabitation as the term is used in this subdivision.

> (b) The income of a supporting spouse's subsequent spouse or nonmarital partner shall not be considered when determining or modifying spousal support.
>
> (c) Nothing in this section precludes later modification or termination of spousal support on proof of change of circumstances.

**5.** The version of Cal.Civ.Code § 4801.5 applicable to the parties in *Leib* provided:

> Upon the petition of a spouse who has been ordered to pay support ..., the court shall revoke the order for support upon proof that the spouse to whom support has been ordered to be paid is living with a person of the opposite sex and holding himself or herself out as the spouse of the person for a total of 30 days

created a rebuttable presumption of decreased need that the wives failed to overcome with evidence of actual need, those courts were statutorily entitled to base their equitable determinations of decreased financial need on the limited facts before them because the supporting spouses no longer had a burden of proof.

In Arizona, domestic relations courts have only those equitable powers that are authorized by statute. *Martin v. Martin*, 156 Ariz. 452, 456, 752 P.2d 1038, 1042 (1988). In Arizona, termination of spousal maintenance can occur only upon the death of either party or the remarriage of the party receiving maintenance, and modification of spousal maintenance can occur only upon a showing of substantial and continuing changed circumstances that are economic in nature. *See* A.R.S. § 25–327; *Smith v. Mangum*, 155 Ariz. at 451, 747 P.2d at 612. In Arizona, the burden of establishing those changed circumstances is always on the party seeking the modification, in this case, husband; that burden does not shift to presume reduced need merely upon a showing of cohabitation. *Scott v. Scott*, 121 Ariz. at 494, 591 P.2d at 982; *Smith v. Mangum*, 155 Ariz. at 451, 747 P.2d at 612. In Arizona, therefore, husband must establish, by a preponderance of the evidence, that wife's economic need for support has actually diminished as a result of the cohabitation.

Other courts that have considered this issue, in the absence of such a statutory presumption as that legislated in California, have concluded that a finding that the cohabitant was not providing financial support to the household was not determinative of the spouse's reduced financial need to support termination of that spouse's alimony. *See, e.g., Perri v. Perri*, 79 Ohio App.3d 845, 608 N.E.2d 790 (App.Dist. 2 1992) (termination of alimony was erroneous, but remanded for a potential reduction in alimony to the extent the cohabitant was benefitting from alimony, not including wife's fixed expenses that would be the same with or without him); *Smith v. Smith*, 849 P.2d 1097 (Okla.App. 1992) (where no showing was made that

or more, either consecutive or non-consecutive, although not married to the person....

wife's expenses decreased after cohabitation, trial court could not reduce her alimony); *In re Marriage of Dwyer*, 825 P.2d 1018 (Colo. App.1991) (trial court did not err in continuing wife's alimony despite fact she is cohabitating, in light of evidence that she is still in financial need); *Mitchell v. Mitchell*, 418 A.2d 1140 (Me.1980) (upholding trial court's finding that, despite cohabitation, wife's financial circumstances had not changed). We find that these cases exhibit a sound approach more in line with Arizona's statutory scheme than do the California cases cited by husband.

Rather than utilizing a hypothetical approach of what the equitable benefit to the cohabitant might be from the supported spouse's contribution to the household under an "implied contract" theory, these courts adopt a more factual inquiry into what the economic effect of the cohabitation actually is on the supported spouse, not the cohabitant. For example, in *Mitchell*, where the supporting husband argued that the cohabitant's lack of income was evidence that the supported wife was supporting her cohabitant with her alimony, the court concluded:

> Mrs. Mitchell's cohabitation with her friend has no relevance except insofar as the arrangement actually affects the former wife's financial circumstances....
>
> ....
>
> In addition, even if the alimony did benefit her friend that fact would not prove that the former wife's needs have decreased. For example, her friend benefits from her expenditures on heating fuel, *but the cost to Mrs. Mitchell is the same as if she lived alone.* Additional evidence is necessary to prove that Mrs. Mitchell does not need alimony.

418 A.2d at 1143 (emphasis added). Similarly, in *Perri*, the court concluded that, even though the supported wife permitted a cohabitant to stay at her residence and she paid all the bills, she was still dependent on alimony for her sustenance:

> Where, as here, the evidence fails to establish that the paramour has undertak-

*See Leib*, 145 Cal.Rptr. at 764.

en any obligation of support, much less an obligation of *total support,* ... we believe that the proper focus of the trial court's inquiry should be on whether Mrs. Perri's relationship with [her cohabitant] "produced a change of circumstances sufficient to entitle Mr. Perri to relief." ... In other words, the focus should be on whether an appreciable amount of the sustenance alimony paid by Mr. Perri directly benefited [the cohabitant]. *From the evidence, it would appear that Mrs. Perri's living expenses, other than for food, would have been the same regardless of whether [the cohabitant] shared her residence with her.* However, this is not to suggest that on remand the trial court is not at liberty to determine, if supported by the evidence, that the situation produced a change of circumstances sufficient to entitle Mr. Perri to relief. However, *the relief would not be a termination of sustenance alimony,* but a reduction of sustenance alimony to the extent that it directly benefited [the cohabitant]. *Mrs. Perri was not in need of that portion of the alimony, if any, that directly benefited [the cohabitant], such as the cost of the food for him for which she paid.*

608 N.E.2d at 794 (emphasis added, and citations omitted). Likewise, in *Smith v. Smith,* where the husband conceded that his ability to pay support had not changed, the only issue remaining was whether the wife's need for support had decreased; upon evidence that her fixed expenses and debts were substantially the same at the time of the modification hearing as they were at the time of the decree, the court held that the husband had not met his burden of proof to reduce support despite wife's cohabitation and spending from her savings in support of her cohabitant. 849 P.2d at 1098–99. In *Dwyer,*

the court upheld an order for continuing spousal maintenance on a record that established that the wife was unable to support herself without it, despite her cohabitant's noncontribution to her support. 825 P.2d at 1020.

■■■■ Applying these principles to this case, we conclude that husband has not met the burden of proof to establish wife's financial independence as a result of Galvin's cohabitation. We already have concluded that wife's income and earning abilities have not changed substantially since the entry of the decree, and that there has been no showing that a sale of the house was either required or sufficient to enable her to be self-supporting. No evidence was presented that wife's fixed household expenses contemplated by the decree increased as a result of Galvin's cohabitation. Nor was evidence presented to show any scheme to make wife pay all household expenses for the sole purpose of providing Galvin with the resources to afford the couple's luxuries. Rather, the evidence indicated that Galvin still maintained his own condominium residence in Tempe, although he currently did not live there. Additionally, we do not find any evidence that the gifts wife obtained from Galvin, as her cohabitant, were any more or less than she might receive from a fiance who did not live with her.[6] Even under the California approach, a cohabitant's *gifts of personal property* need not be considered as significant contributions to the wife's support. *Schroeder,* 238 Cal.Rptr. at 15–16 (gifts of satellite dish and diamond ring should not be weighed against the rental value of the house). We also agree with the *Schroeder* court, however, that a supported spouse cannot evade the purposes of spousal maintenance by "accepting 'gifts' in lieu of monetary reimbursement for joint household expenses, and thereby create a situation of

---

6. We have found no case in which a court either terminated or reduced spousal maintenance on the basis of a gift of jewelry or travel by a noncohabitant. If such a gift does not either increase income or decrease expenses of the supported spouse, it should not be considered a changed circumstance whether or not a cohabitant is involved.

We also point out that, taking husband's equitable approach to its logical extension, in the absence of a statutory provision such as that

enacted in California, *see* note 3, *supra,* if we were to reduce spousal maintenance by half the household expenses whenever a cohabitant was living with the *supported* spouse, in the interests of equity and fairness we would also have to consider requests for increased spousal maintenance when the *supporting* spouse's expenses were likewise reduced through cohabitation, creating greater disposable income from which to pay spousal maintenance. Such a result is not warranted by our existing statutory scheme.

apparent continuing need." 238 Cal.Rptr. at 17. Because we find no evidence of such intent on this record, we do not find that Galvin's gifts served to decrease wife's support needs.

Based on the facts in this record, we hold that the trial court erred in terminating spousal maintenance, in the absence of any showing by husband that wife has become financially independent prior to the three-year term of maintenance provided in the decree.

### B. *Reduction of Wife's Spousal Maintenance*

■ Because the trial court terminated spousal maintenance in this case, it did not make findings regarding husband's alternative request for a reduction in spousal maintenance based on changed circumstances.

We believe this record contains a factual question whether husband has shown substantial and continuing changed circumstances to entitle him to a partial reduction in the $13,000 per month spousal maintenance effective March 1993. *See* A.R.S. § 25–327(A). For example, wife testified that her mortgage payment had decreased for a period of time in excess of $1,500 a month less than it was at the time of the decree, and had stabilized in May 1993 at a fixed rate of interest at a monthly payment approximately $1,000 less than that contemplated at the time of the decree. Wife also admitted receiving one-half of the parties' $66,000 income tax refund after their accountant discovered an error on a prior tax return; she testified she had utilized that $33,000 for household expenses when husband stopped making spousal maintenance payments in January, February, and March 1993. Additionally, husband has established that wife received, as compensation from her involvement with ESI, child care services valued at $400 per month that she might otherwise have to pay if employed elsewhere. Furthermore, wife testified that one financial benefit of her cohabitation with Galvin was the house maintenance and repairs he performs "that would normally cost a lot of money to have done." These and any other reductions in wife's household expenses, or expenditures she incurs by the addition of Galvin to her household, may be considered on remand to determine to what extent, if any, wife's spousal maintenance should be reduced under the statutory standards of A.R.S. § 25–327, with husband carrying the burden of proof.

We realize that our rejection of the California approach may be criticized as resulting in inequities in some cases where a supported spouse may abuse the purposes of spousal maintenance to gain an unfair financial advantage from cohabitation. We also acknowledged this potential for inequity in *Smith v. Mangum*, and we reaffirm here our conclusion there:

> The Arizona statutes are clear, however, and any changes in such declared policy must originate in the legislature.... A number of states—most notably California, Illinois, and New York—have enacted statutes that specifically deal with this problem.... If changes in Arizona law are desirable, they should be left to legislative action and not to the courts.

155 Ariz. at 451, 747 P.2d at 612 (citations omitted). We continue to believe that such a policy change should result from statutory amendment, not judicial decision.

### ATTORNEYS' FEES

Wife has requested an award of attorneys' fees incurred in the trial court and on appeal pursuant to A.R.S. § 25–324. Under this statute, the court may award such fees after considering the financial resources of both parties.

■ We are unable to determine from the record before us the current financial resources of the parties. Additionally, we cannot award fees incurred in the trial court when they were not requested there. *See Lacer v. Navajo County*, 141 Ariz. 392, 395, 687 P.2d 400, 403 (App.1984). We therefore decline to award fees to wife at this time; however, on remand, the trial court may consider evidence of the parties' current financial resources on the issue of attorneys' fees on appeal, and may determine whether fees should be awarded and, if so, the amount.

## CONCLUSION

We hold that the trial court abused its discretion in terminating wife's spousal maintenance in the absence of evidence that she has become financially independent as a result of her cohabitation. However, the record raises a factual issue regarding whether husband has established a substantial and continuing change of wife's economic circumstances that would warrant a reduction of her spousal maintenance payments effective March 1, 1993. We therefore reverse the judgment and remand to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

GERBER, P.J., and CONTRERAS, J., concur.